35763. AUERBACH *v.* BRESEE *et al.*
35764. SETTLE *v.* AUERBACH *et al.*

DECIDED SEPTEMBER 13, 1955.

*Robert M. McCartney,* for A. Auerbach.
*Robert G. Young, Marshall, Greene & Neely,* for E. C. Bresee.
*Fraser & Shelfer,* for J. J. Settle.

FELTON, C. J. 1. The plaintiff and Mrs. Settle contend that the testimony of the defendant Bresee demands a finding that he was negligent; and Mrs. Settle contends that it demands a finding that Bresee's negligence was the sole proximate cause of the damages. The evidence was in sharp conflict, and the jury, under the facts of this case, was authorized to find that the negligence of Mrs. Settle was the sole proximate cause of the damages. The contention of the plaintiffs in error is that Bresee's testimony on cross-examination demands a finding that he was negligent. We do not think that under the circumstances the jury was re-

quired to interpret Bresee's entire testimony against him to the extent contended for by the plaintiffs in error. The testimony is substantially as follows: "(Called on cross-examination by the plaintiff.) Q. On the night of March 15, 1954, about 9:25 o'clock, were you on Decatur Street headed in an easterly direction? A. Yes, sir. Q. Did you have a collision with another automobile at the intersection? A. Yes, sir. Q. Tell the court and the jury what happened, in your own words. A. I was traveling in an easterly direction, about 9:30. I was in the left-hand lane, right next to the center line. As I entered the intersection I gave a signal, I started my turn and when I—I guess the front part of my car was about three or four feet across the center line when I felt the impact with Mrs. Settle's car, and the impact pushed me just one or two feet side-ways, maybe, and I was about out, I suppose ten feet, and I suppose before I could stop, and her car hit the corner of the building at that intersection. Q. How fast were you traveling, Mr. Bresee? A. Between 5 and 10. Certainly no more than 10. Q. What part of your car did her car hit? A. She ran up the side of me. Started at the left, rear fender, and it ran up my running board and my left, front fender. Q. Did you have any warning at all that she was about to strike you? A. No, sir; I sure didn't. Q. When was the first time you had any warning at all that she was going to hit you? A. Right when I was hit. The impact was the first—. Q. Right when you were hit. A. That's right. Q. You had no idea she was there at all. A. No, sir; I sure didn't. Q. How far back was she when you first saw her? A. I never did see her. Just with the impact, was the first I ever knew she was there. Q. How far back from that turn . . . you say you gave a signal? A. Yes, sir. Q. How far back from that turn would you say you were when you gave that signal, Mr. Bresee? A. I would say about maybe 20 to 25 feet, before the street comes into it, just before where the accident occurred. Q. What kind of a signal did you give? A. I extended my arm horizontally to the ground. Q. Horizontally to the ground? 9. Well, parallel to the ground; horizontally. Q. Parallel to the ground. A. Yes, sir. Q. Did you give your signal between the northwest corner and the underpass? A. Could I see a picture there? Q. Yes, sir. A. I would like to have that. Q. Come right down here

where the jury can see you. Can you state from that picture where you gave the signal? A. I wonder if I could use another one? Q. Yes, sir. A. I would say about 20 or 25 feet in front of that intersection. Q. You mean back in that direction? A. Yes, sir. Coming this way. Q. Does that point show on this picture? A. No, sir. I believe it is excluded from this picture. Q. You were referring to plaintiff's exhibit 2, just now? A. Yes, sir. Q. Did you look back to see if the way was clear, before you started your turn? A. I looked in the rear-view mirror. Q. You looked in the rear-view mirror. A. I didn't see anything. Q. You didn't stop before you made the turn, did you? A. No, sir. Q. Just put your arm out and just cut. Just kind of a. . . A. Yes, sir. Q. Didn't stop. When did you glance in your mirror? A. About the same time I gave the signal. Q. You didn't look in the mirror at any time after that. . . A. No, sir. Q. (Continuing) . . . until the collision took place? A. I don't believe so. Q. You say after you held out your hand, then, I believe, and started your turn; that's where you were hit. A. Yes, sir. Q. How far did you travel before you pulled your arm in and started to turn? A. I guess the front of my car had turned approximately three or four feet. Q. You were on Mrs. Settle's right? A. Yes, sir. Q. She was on your left-hand side? A. Yes, sir. Q. And you undertook to make that turn before the collision took place, didn't you? A. Yes, sir. Q. You were four or five feet before there was any impact, after you started turning? A. About four feet; yes, sir. Q. About four feet. So you cut right in front of her, going the same direction you were going, without knowing whether anybody was back behind you, or not, didn't you? A. Yes, sir. That's about it. Q. About it.

"(Cross-examination by counsel for the defendant, Mrs. Settle.) Q. Your last statement was that you cut in front of Mrs. Settle without knowing whether she was there, or not; isn't that right? A. But the thing about it, I was in the left-hand lane next to the center line, and I gave an adequate signal before I started my turn. Q. You never did see her. A. No, sir; I never did. Q. You never did cut your eyes back to the left to see whether you could see somebody? A. No, sir; I didn't. Q. You just relied on that glance in the mirror? A. Yes, sir. Q. At the police

station you testified you didn't stick your hand out until after you had passed that northwest corner. Don't you remember that? A. I don't believe that was in the testimony. Q. I'll find it. Didn't you state, when you testified in the police court, that you didn't stick your hand out until after you had passed this corner, here, and you were right about in the middle of that intersection? A. I don't believe I did say it. I think it was misunderstood, if I did. Q. Now was anybody . . . do you remember me asking you this question in police court: 'Q. You say you gave your signal between the northwest corner and the underpass? A. Yes, sir; a little before that, probably. Nearer the corner, over there.' A. Yes, sir. Meaning the first corner. Q. I mean the first corner. After you had passed the first corner. There are two intersections there. A. Yes, sir. Q. The underpass divides those intersections. There are two streets coming in at Decatur Street, isn't there? A. Yes, sir. Q. One on each side of the underpass? A. Yes, sir. Q. And we were talking about the first street. You said at police court you stuck your hand out after you passed the corner by, between the building and the underpass; probably a little bit closer to the building than the underpass; isn't that right? A. I didn't think that was what I said. It might have been, at the time. Q. Well, this was taken a year ago, wasn't it? This was taken April, 1954, 2 p. m., at the police station. That's nearly a year ago. That was only a couple months after the accident, wasn't it? A. Yes, sir. . . Q. Do you remember that when I first asked you this question in police court: 'Q. Now, did you look in your mirror before you made your turn?' And your answer was: 'A. No, sir.' You don't remember saying that? A. Did I say anything else along with that? Q. Then in the same answer you said: 'I glanced in the mirror but I didn't see any headlights shining in my mirror.' A. That was what the 'No' was for that preceded it. I said it all in one breath, if I remember. Q. All right. Let's repeat the answer, then. You said that's what the 'No' was for. Did you look into your mirror? A. Yes, sir. Q. Why did you say 'No, sir'? A. The 'No' was for I didn't see anybody when I looked in the mirror. A. That's what you say now. The 'No' was because you didn't see anybody. A. That's what I meant then. Q. The question was: 'Did you look in your mirror before you made your

turn?' The answer was: 'No, sir.' Then you apparently took that back and said: 'I glanced in the mirror but didn't see any headlights shining in my mirror.' The reason you didn't see any headlights, if you did look in your mirror, was because the car was right beside you. A. Yes, sir. Q. And you didn't glance your eyes back to see if there was anything beside you. You didn't glance back. You just now said you didn't. A. No, sir; I didn't glance back. Q. You just took a chance there was nobody there, and you just took a left turn across Decatur Street. A. Yes, sir.

"(On direct-examination in his own behalf.) Q. Immediately prior to this accident what direction were you traveling? A. In an easterly direction. Q. On what street? A. Decatur. A. And where did the accident occur? A. At approximately the middle of the intersection of Boulevard and Decatur Streets. Q. Now, as you approached this intersection what lane of traffic were you in? A. I was in the left-hand lane, next to the center line. Q. Next to the center line. Now you say left-hand lane. How many lanes were in that street? A. There were just two lanes. Q. Were you in the. . . A. I was in the right-hand lane, next to the center line. Q. Right-hand lane next to the center line? A. Yes, sir. Q. And as you approached, how long had you been next to the center line as you approached that intersection, and how far back? A. It was a pretty good ways. I really don't remember when I got on Decatur Street, but I imagine it was ever since I got on Decatur Street. Q. Well, you were in the . . . how far back is there two lanes on Decatur Street? A. I believe it is two lanes all the way into town. I am not sure about that. Q. As you approached that intersection what did you do? A. I gave the signal. Q. What sort of a signal did you give? A. Stuck my arm out the window, parallel with the ground. Q. How far back from the intersection, or where did you give that signal? A. I guess it was about 20 or 25 feet before that first intersection street, Boulevard, there. . . Q. Now, what sort of a . . . what was the temperature that night? A. It was very chilly that night. Q. Did you have your window up? A. No, sir; I had it down. Q. Did you have it up before you approached the intersection? A. I had been driving with it up; yes, sir; a couple blocks before then. Q. Was it

necessary for you to lower your window? A. Yes, sir; it was. Q. You put . . . to put your arm out? A. Yes, sir. Q. Did you do that? A. Yes, sir. Q. When you put your arm out did you know whether a car was back of you, or not? A. No, sir. I didn't know it was back there. Q. And at the time you put your arm out where was your car located in relation to the center line? A. It was right next to the center line. . . Q. When did you start making your turn, and where? A. Could I use the picture? . . Q. And that's where you started making your turn? A. Yes, sir. Q. How far had you gone before you were struck? A. Well, the front of my car had passed over the center line just a couple feet; three or four feet, maybe. Q. How about the rear of your car? A. It was probably just a little bit still on my side of the street, I imagine. Q. And that was at the point of impact; at the time of impact? A. Yes sir. . . Q. What side of the street was Mrs. Settle on, then, when her vehicle struck your vehicle? A. Well, I judge that her right set of tires were just about on the center line. . . Q. Then what side of the street was her car on? A. It was on the left side of the street. Q. In what lane of traffic was that? A. In the westerly moving traffic. Q. Is that the opposite lane of traffic from the direction in which you were traveling? A. Yes, sir. . . Q. Did her car hit your car . . . how hard did her car hit your car? A. Well, on mine, it was just more or less of a side-swipe. It wasn't a direct hit. It kind of side-swiped me. It just pushed me a little bit."

2. It is contended by both appellants that the court's charge authorizing the jury to find in favor of both defendants was error, in that there was no evidence authorizing the finding that the occurrence was an accident. The charge was not harmful to the plaintiff below because the jury did not find for the theory of accident. It was not harmful to Mrs. Settle because it was favorable to her.

There is likewise no merit in any of the other special grounds of the motions for new trial.

The court did not err in denying the motions of the respective parties for a new trial.

*Judgments affirmed. Quillian and Nichols, JJ., concur.*